# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51944-5-II |
| Respondent, | |
| v. | |
| D.A.D., | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — DD appeals from a juvenile court adjudication for manslaughter in the second degree for the death of EV. DD contends that insufficient evidence supports his adjudication, the State failed to present evidence establishing the corpus delicti of the crime, and the trial court violated his Sixth Amendment right to control his defense by finding him guilty of a lesser-included offense. We affirm.

## FACTS[1]

DD and EV were both 13 years old and good friends. On October 13, 2017, EV spent the night at DD's home. The next morning the boys went to DD's grandparent's home. DD's cousin, EF, was at their grandparent's house when the boys arrived. Only the three children were in the home.

---

[1] The following facts rely in part on the trial court's findings of fact, which are, with the exception of findings 13, 17, and 20, unchallenged and therefore verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

EF heard the boys chasing each other and heard DD tell EV to stop chasing him. She then heard a popping sound. DD came into EF's room upset and told her he "'shot [EV].'" Clerk's Papers (CP) at 74. DD called 911. He told the dispatcher, "Uh, . . . shotgun. . . . I didn't know it was loaded. . . . I'm sorry." 1 Report of Proceedings (RP) at 136.

Deputies Ness Aguilar and Jason Hammer responded to the 911 call. DD's mother came to the house and comforted DD. Aguilar overheard Dunn tell his mother, "I thought it was empty." 1 RP at 85. EV died as a result of being shot by a 12-gauge shotgun held by DD.

DD told Hammer that EV had been chasing him and then DD "went into the master bedroom, retrieved a shotgun, racked it to make sure it wasn't loaded, and then fired it at [EV]." 1 RP at 149. Hammer observed the shotgun propped up against the wall in the master bedroom adjacent to the living room. The master bedroom had French doors that opened to the living room. EV was lying on the couch in the living room. Hammer observed that EV had fallen directly in line with a person looking straight out of the master bedroom through the doors. Following this same line, beyond EV, Hammer observed holes in the kitchen window consistent with overspray from a shotgun blast.

Emergency Medical Technician Jonathan Woods asked DD what happened. DD told Woods that he "racked the gun and a [shell] came out." 1 RP at 103. DD told Woods he then "pointed [the shotgun] at [EV]" and "pulled the trigger." 1 RP at 103. DD said he did not think the shotgun was loaded. Woods asked DD if he had ever shot the gun before. DD told Woods he was familiar with the shotgun and had shot "that particular gun" "multiple times." 1 RP at 103.

Deputy James Hanberry overheard DD tell his grandmother, "I thought it was unloaded" and "[h]e was chasing me." 1 RP at 128. And DD texted a friend, NW, that he "shot EV." 2 RP at 253; Ex. 127.

2

The State charged DD with manslaughter in the first degree while armed with a firearm.

During trial, Detective Brad Thurman testified that he was one of the investigators at the scene. Thurman observed six indentations from shotgun pellets in the kitchen window beyond EV and in line with the shotgun blast. Thurman measured the distance from the master bedroom to EV and to the kitchen window along the same line of sight. The distance from the master bedroom to the couch was a distance that ranged from 30 feet 3 inches to 37 feet.

The medical examiner, Dr. Clifford Nelson, testified that EV was 74 inches tall and had received a shotgun blast to the front of his body. Nelson testified that the cause of EV's death was a shotgun wound to the head, neck, and chest. Nelson explained that the largest accumulation of the pellet mass was to EV's lower neck area. The shotgun spread measured 17 inches by 15.5 inches. When asked if the pellet spread would be different based on if the gun was shot at "three feet" (e.g., waist level) or "four and a half or five feet" (e.g., shoulder level), Nelson first replied he didn't understand the question and then, after a demonstration, stated, "Not much." 2 RP at 372.

The shotgun was later test-fired at various distances using the same type of shell that had been fired. At a distance of 33 feet, the spread of the pellets was 16 to 17 inches in diameter.

DD testified that he had gone into his grandparent's bedroom and handled the shotgun. DD claimed he pulled a lever on the shotgun to make sure it was unloaded. He testified that he twirled the shotgun around and that while he was playing around the shotgun discharged. He claimed he had no knowledge of where EV was when the shotgun discharged. He also claimed he did not pull the trigger. DD admitted he knew it was important to know how to use a gun before operating it. DD agreed that one of the rules he had learned was not to point guns at people or pull the trigger while a gun is pointed at a person. DD admitted that he knew the shotgun was capable of killing

a person. He also admitted that he had violated his grandfather's rule to not play with the gun. DD estimated that he has fired a firearm "[a]bout 10 times." 3 RP at 558. DD testified that when the shotgun discharged he was holding it slightly above his waist.

During closing argument, defense counsel stated, "Did [DD] have intent? Did he have recklessness? Did he have criminal negligence? . . . That's what we're here to decide, not did it happen." 3 RP at 641. Counsel continued, "And the State mentioned criminal negligence which is the, you know, mens rea associated with . . . Manslaughter in the Second Degree." 3 RP at 652. Counsel then stated, "A person is criminally negligent or acts with criminal negligence when he or she fails to be aware of [a] substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard." 3 RP at 652. Counsel continued, "And he was not guilty of the lesser offense of Manslaughter in the Second Degree because he did not act with criminal negligence." 3 RP at 653.

The trial court entered findings of fact and conclusions of law. Specifically, the court found that DD "fired the shotgun 30-33' away from his grandparent's bedroom into the living room at [EV]." CP at 74. The court also found:

> 13. [DD's] testimony as to how he was holding the shotgun at the time it discharged is not logical. The height at which [EV] was shot and where the pellets struck the window beyond him contradict [DD's] testimony.
> . . . .
> 17. [DD's] statements to the first responders were reliable. They were made close in time to the event and they are supported by the physical evidence and the texts to [NW].
> . . . .
> 20. [DD] had fired a different 12-gauge shotgun approximately 10 times.

CP at 74. The trial court then concluded:

> 9. When [DD] who had been taught gun safety, had been taught not to touch the gun in his grandparent's room, knew enough about guns to know the danger they present, manipulated the gun to complete the two-step process to load the chamber of the gun, knew the guns [sic] can fire and cause damage, and with this knowledge

4

still chose to point the 12-guage [sic] Benelli shotgun at [EV] and pull the trigger while holding it at shoulder height 30-33' away, he failed to be aware of a substantial risk that a wrongful act may occur, and this failure was a gross deviation from that of a reasonable 13-year-old with his experience with firearms in the same situation.

CP at 76.

The trial court found DD guilty of the lesser-included offense of manslaughter in the second degree while armed with a firearm. The court sentenced DD to 30 days plus a four-month firearm enhancement. DD appeals.

## ANALYSIS

I.    SUFFICIENCY OF EVIDENCE

DD argues that the State failed to present sufficient evidence of his adjudication because it did not prove that he acted with criminal negligence. Specifically, he challenges the trial court's finding that "he had fired a differnet12-gauge shotgun approximately 10 times." CP at 74 (Finding of Fact (FF) 20).[2] We disagree.

A.    Standard of Review

Due process requires that the State prove every element of a crime beyond a reasonable doubt. U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3. Where a defendant claims insufficient evidence to support his conviction, we determine whether viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Andy*, 182 Wn.2d 294, 303, 340 P.3d 840 (2014). "'A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be

---

[2] We note that DD also assigned error to findings of fact 13 and 17 but fails to provide any argument with regard to these challenged findings. Accordingly, we do not address the challenged findings of fact. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (failure to present argument regarding a challenged finding of fact waives assignment of error as to that finding).

drawn therefrom.'" *Andy*, 182 Wn.2d at 303 (internal quotation marks omitted) (quoting *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004)). We defer to the trier of fact "'on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence.'" *Andy*, 182 Wn.2d at 303 (quoting *Thomas*, 150 Wn.2d at 874-75).

"When reviewing the sufficiency of evidence in support of a conviction following a bench trial, we determine whether substantial evidence supports the challenged findings of fact and whether the findings support the trial court's conclusions of law." *State v. Smith*, 185 Wn. App. 945, 956, 344 P.3d 1244 (2015). Substantial evidence is evidence that is sufficient to persuade a fair-minded, rational person that the findings are true. *Smith*, 185 Wn. App. at 956. The party challenging a finding bears the burden of demonstrating that the finding is not supported by substantial evidence. *Smith*, 185 Wn. App. at 957.

B.    Legal Principles

"A person is guilty of manslaughter in the second degree when, with criminal negligence, he or she causes the death of another person." RCW 9A.32.070(1). A person "acts with criminal negligence when he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in that situation." RCW 9A.08.010(1)(d). When a statute provides that criminal negligence suffices to establish an element of an offense, such element also is established if a person acts intentionally, knowingly, or recklessly. RCW 9A.08.010(2).

C.    Criminal Negligence

Here, Woods testified that DD told him that he was familiar with the shotgun and had shot it "multiple times." 1 RP at 103. DD testified that he estimated that he has fired a firearm "[a]bout

10 times." 3 RP at 558. This testimony provides substantial evidence to support the trial court's finding of fact 20 that DD "had fired a different 12-gauge shotgun approximately 10 times." CP at 74.

Regarding criminal negligence, in *State v. Fondren*, 41 Wn. App. 17, 24, 701 P.2d 810 (1985), the jury found Fondren guilty of manslaughter in the second degree after he and another individual were struggling for a gun and the gun accidently discharged, killing the other individual. Fondren appealed arguing, *inter alia*, that sufficient evidence did not support his conviction. We held that while no one saw Fondren pull the trigger, he was criminally negligent for bringing a loaded gun to the scene. *Fondren*, 41 Wn. App. at 24.

Similarly, here, DD was aware that the shotgun was capable of killing, he was aware his grandfather told him not to touch the shotgun, and he was aware that he should not point the shotgun at an individual and pull the trigger. Viewing this evidence in the light most favorable to the State, DD failed to be aware of a substantial risk that a wrongful act may occur and this failure was a gross deviation from that of a reasonable 13-year-old with DD's experience with firearms. Thus, sufficient evidence supports DD's manslaughter in the second degree adjudication. [3]

II.      CORPUS DELICTI

DD next contends that the State failed to present sufficient evidence to establish the corpus delicti, independent of DD's own statements, to support a logical and reasonable inference that EV's death was caused by a criminal act. We disagree.

---

[3] DD briefly touches on the topic of a juvenile's brain development, citing several recent cases regarding juvenile sentencing. DD, however, does not expand on this topic as it relates to DD's assignment of error and does not provide argument relating to the matter currently before us. For this reason, we decline to address this issue further. *Cowiche Canyon Conservancy*, 118 Wn.2d at 809.

A.      Standard of Review

"A defendant's incriminating statement alone is not sufficient to establish that a crime took place." *State v. Brockob*, 159 Wn.2d 311, 328, 150 P.3d 59 (2006) (footnote omitted). The State must present independent evidence to corroborate that the crime described in the defendant's incriminating statement occurred. *Brockob*, 159 Wn.2d at 328. The corpus delicti rule "tests the sufficiency or adequacy of evidence" to corroborate a defendant's incriminating statement independently of that statement. *State v. Dow*, 168 Wn.2d 243, 249, 227 P.3d 1278 (2010). The corpus delicti can be proved by either direct or circumstantial evidence. *State v. Hummel*, 165 Wn. App. 749, 758-59, 266 P.3d 269 (2012).

"The independent evidence need not be sufficient to support a conviction, but it must provide prima facie corroboration of the crime described in a defendant's incriminating statement." *Brockob*, 159 Wn.2d at 328 (emphasis omitted). "Prima facie corroboration of a defendant's incriminating statement exists if the independent evidence supports a 'logical and reasonable inference' of the facts sought to be proved.'" *Brockob*, 159 Wn.2d at 328 (quoting *State v. Aten*, 130 Wn.2d 640, 656, 927 P.2d 210 (1996)). In assessing whether there is sufficient evidence of the corpus delicti, we view all reasonable inferences in the light most favorable to the State and assume the truth of the State's evidence. *Aten*, 130 Wn.2d at 658.

B.      Legal Principles

To establish the corpus delicti of a crime, the State must present prima facie evidence of two elements: (1) an injury or loss and (2) a criminal act causing such injury or loss. *State v. Cardenas-Flores*, 189 Wn.2d 243, 252, 401 P.3d 19 (2017). As applied to DD's manslaughter in the second degree offense, the State was required to present prima facie evidence that there was the death of another person by criminal negligence. RCW 9A.32.070(1). "Criminal negligence

8

occurs when one 'fails to be aware of a substantial risk that a wrongful act may occur' and that unawareness 'constitutes a gross deviation from the standard of care that a reasonable [person] would exercise in the same situation.'" *Atens*, 130 Wn.2d at 658 (quoting RCW 9A.08.010(1)(d)). The corpus delicti in homicide cases requires both the fact of death and a causal connection between the death and a criminal agency; it does not require proof of a causal relation between the death and the accused. *State v. Lung*, 70 Wn.2d 365, 371, 423 P.2d 72 (1967).

> C.      Death by Criminal Negligence

Here, EV died from a shotgun wound. DD fired the shotgun from "30-33' away . . . into the living room at [EV]." CP at 74 (unchallenged FF 14). No weapon was found near EV and there was no evidence of any shooting in self-defense. The spread of the shotgun blast was from a distance that made it impossible for EV to have shot himself. It also eliminated any possibility that the shotgun had been fired during a struggle between EV and another. And, according to EF, DD and EV were chasing each other in another room when she heard DD tell EV to stop chasing him and then heard a popping sound.

Based on this evidence, EV's death was consistent with having been shot by another person in a negligent manner. Accordingly, DD's statements that he pointed the gun at EV and pulled the trigger, as well as his numerous other statements admitting to shooting EV, were corroborated by independent proof sufficient to establish corpus delicti. Accordingly, DD's corpus delicti contentions fail.

III.    RIGHT TO CONTROL DEFENSE

DD next contends his constitutional right to control his defense was denied because the trial court found him guilty of a lesser-included offense after he dedicated his defense to the charged offense of manslaughter in the first degree. We disagree.

A.      Standard of Review

Implicit in the Sixth Amendment is a criminal defendant's right to control his defense. *State v. Jones*, 99 Wn.2d 735, 740, 664 P.2d 1216 (1983). We review constitutional violations de novo. *State v. Lynch*, 178 Wn.2d 487, 491, 309 P.3d 482 (2013).

B.      Legal Principles

A defendant may be found guilty of a lesser-included offense than that charged in the information. *State v. Nguyen*, 165 Wn.2d 428, 434, 197 P.3d 673 (2008).

In a bench trial, the trial court judge, as the trier of fact, may consider the charged offense as well as any lesser-included offense. *In re Pers. Restraint of Heidari*, 159 Wn. App. 601, 609-10, 248 P.3d 550 (2011), *aff'd*, 174 Wn.2d 288 (2012). And the trial court may, sua sponte, convict a defendant of a lesser-included offense. *State v. Jollo*, 38 Wn. App. 469, 474, 685 P.2d 669 (1984). Moreover, "[b]ecause the defendant must have notice of the offense of which he or she is charged, the elements of any lesser included offense must necessarily be included in the elements of the offense as charged. A defendant thus implicitly receives constitutionally sufficient notice." *State v. Berlin*, 133 Wn.2d 541, 545, 947 P.2d 700 (1997).

C.      No Constitutional Violation

Here, DD was on notice that he could be convicted of a lesser-included offense. This is evidenced by defense counsel's closing remarks, "Did [DD] have intent? Did he have recklessness? Did he have criminal negligence? . . . That's what we're here to decide, not did it happen." 3 RP at 641. Counsel continued, "And the State mentioned criminal negligence which is the, you know, mens rea associated with . . . Manslaughter in the Second Degree." 3 RP at 652. Counsel then stated, "A person is criminally negligent or acts with criminal negligence when he or she fails to be aware of [a] substantial risk that a wrongful act may occur and his or her failure

10

to be aware of such substantial risk constitutes a gross deviation from the standard." 3 RP at 652. Counsel continued, "And he was not guilty of the lesser offense of Manslaughter in the Second Degree because he did not act with criminal negligence." 3 RP at 653.

DD was on notice that he could be convicted of manslaughter in the second degree. Defense counsel acknowledged as much by arguing against manslaughter in the second degree during closing arguments. DD fails to provide persuasive legal authority to support his arguments that being convicted of a lesser-included offense violates his right to control his defense or that juveniles are more at a disadvantage when convicted of a lesser-included offense because they cannot request a jury trial. For this reason, his arguments fail. We hold there was no violation of DD's right to control his defense.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Maxa, C.J.

_____
Sutton, J.